## GEORGE STETSON *versus* CITY OF BANGOR.

A State tax assessed April 1, 1864, by the assessors of the city of Bangor, to a citizen thereof, upon his shares in a national bank situated therein, and established under the Act of Congress of Feb. 25, 1863, is constitutional, if levied in the same manner and to the same extent as taxes on other similar property.

R. S., c. 6, § 5, authorizing taxes to be assessed upon "all shares in moneyed corporations," includes shares in national banks.

Sections 79 to 82 of c. 47 of the R. S., prohibiting the establishment of moneyed corporations unless specially authorized by the Legislature, do not apply to banking corporations established by authority of Congress.

On Report.

Assumpsit to recover back taxes assessed April 1, 1864. The facts sufficiently appear in the opinion.

*Rowe & J. A. Peters*, for the plaintiff.

*A. W. Paine*, for the defendants.

Dickerson, J.—The plaintiff, a citizen of Bangor, and owner of shares in the First National Bank in Bangor, established under the Act of Congress, approved Feb. 25, 1863, brings this action to recover the amount of the tax assessed on his shares by the assessors of Bangor, and paid by him under protest and arrest.

The question presented for our consideration is whether the shares of the plaintiff are legally taxable by State authority. In a complex political system like ours, with one government for national purposes, and several governments for local purposes, each vested with important powers and charged with grave duties, it is a difficult and delicate task to define the boundary of their respective spheres of action. A careful study, however, of the history of the constitution. its language and the construction put upon it by the illustrious statesmen and jurists who were called upon to interpret it, in the infancy of the republic, can hardly fail to afford a clear insight into the nature of our government, state and national, and the principles upon which both should be administered. The utter impotency of the States, while acting under the Articles of Confederation, to accomplish the purposes of an independent government, and the embarrassments and conflicts of authority resulting therefrom, taught the American people the necessity of a common and higher sovereignty, that should be inspired and vitalized by the collective wisdom of the whole people, and rest upon their voluntary consent. The great desideratum of the hour was the unification of the American people under a government of enumerated powers for national purposes, and the preservation of the rights of the States in respect to local self-government.

The preamble to the constitution, in contradistinction from the Articles of Confederation, declares it to be the work of " THE PEOPLE OF THE UNITED STATES," "ordained and established" by them to secure for themselves and their posterity a more perfect union, liberty, justice and tranquillity, and to provide for the common defence and general welfare. The supremacy of the national government is established by the requirement of the constitution, that "the United States shall guarantee to every State in the Union a republican form of government," by the grant of power to Congress " to make all laws which shall be necessary and proper for carrying into execution all the foregoing powers, and all other powers vested by this constitution in the government of the United States, or in any department or officer thereof," and in the declaration, that " this constitution and the laws of the United States, which shall be made in pursuance thereof; and all the treaties made, or which shall be made under the authority of the United States, shall be the supreme law of the land ; and the Judges in every State shall be bound thereby, anything in the constitution or laws of any State to the contrary notwithstanding."

From the supremacy of the national government it results that the States have no authority to obstruct or embarrass its action, while in the exercise of its legitimate powers. Under the constitution a nation took the place of a league of States.

But in order to secure to the States their then existing right to local self-government, the constitution declares that " the powers, not delegated to the United States, nor prohibited to the States, are reserved to the States or the people." This prohibition upon the national government against encroaching upon the reserved rights of the States, in connection with the sovereign powers granted to it, establishes an equipoise between the centripetal and centrifugal forces of our political system, and was intended to guard against the opposite dangers of consolidation and decentralization.

Stetson *v.* City of Bangor.

The authors of the constitution established a framework of government, capable of a practical and reasonable application, enumerating the great substantive powers of government, and leaving it for the Supreme Court of the United States to determine, in a given case, whether the power exercised, when not enumerated in the constitution, is an original independent power, and therefore not authorized, or one incident to, or implied from a granted power, or " necessary and proper" to carry a granted power into effect, and therefore authorized by the constitution. Great and marvelous as was their sagacity, they could not foresee all the possible crises that might thereafter arise in public affairs, nor could their wisdom devise the specific means by which the enumerated powers could be best executed. In process of time the means then deemed best might prove insufficient, or more judicious ones might be discovered. Opportunity was, therefore, left whereby the lessons of experience, taught by the future development of their system, and the improved state of civilization might be made available.

The struggle between the opposing forces of our political system arose at an early period of our constitutional history. In 1818, the General Assembly of Maryland passed an Act which provided that all bills, issued by the branch bank of the United States Bank at Baltimore, should be issued on stamped paper, furnished by the State of Maryland, at the rate of ten cents, payable by the bank, for every five dollar note so issued by it, upon penalty of forfeiting five hundred dollars for each and every offence.

James H. McCulloch, the cashier of the bank, disregarded the law of Maryland, and an action was brought against him in the Court of Appeals of Maryland, in the name of the State; and that Court rendered judgment against him. A writ of error was sued out in the Supreme Court of the United States, by the defendant, to reverse the judgment of the Court of Maryland.

The Supreme Court of the United States reversed the judgment of the Court of Appeals, holding, —

1. That, although there is no express power in the constitution of the United States to establish a United States Bank, yet such power may be "necessary and proper to carry into effect the enumerated powers" of Congress, "to borrow money on the credit of the United States," and "to regulate commerce;" and that it is competent for Congress to determine the question of "necessity," under the constitution ; — and

2. That the law of Maryland, imposing a tax on the operations of the Branch Bank of the United States, was unconstitutional. *McCulloch* v. *Maryland*, 4 Wheat., 415.

In delivering the opinion of the Court in that case, Chief Justice MARSHALL says, — "The power to tax involves the power to destroy; the power to destroy may defeat and render useless the power to create. There is a plain repugnance in conferring on one government power to control the constitutional measures of another, which other, with respect to those very measures, is declared to be supreme over that which exerts the control."

Again, he remarks, — "If the States may tax one instrument employed by the government in the execution of its powers they may tax any and every other instrument. They may tax the mail; they may tax the mint; they may tax patent rights ; they may tax the papers of the custom house ; they may tax judicial process ; they may tax all the means employed by the government, to an excess which would defeat all the ends of government. This was not intended by the American people. They did not design to make their government dependent on the States." And, further, — "The States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government."

In *Weston* v. *The City of Charleston*, 2 Pet., 171, which

was the case of a tax assessed by authority of the defendants in error on United States stock owned by the plaintiff in error, the Supreme Court of the United States held that the tax was a tax on the contract, a tax on the "power to borrow money on the credit of the United States," and consequently repugnant to the constitution. In that case the Court say, — "The American people have conferred the power of borrowing money upon their government, and, by making their government supreme, have shielded its action in the exercise of this power from the action of the local governments. The grant of the power is incompatible with a restraining or controlling power, and the declaration of supremacy is a declaration that no such restraint or controlling power shall be exercised."

"The right to tax the contract to any extent, when made, must operate upon the power to borrow money before it is exercised, and have a sensible influence on the contract. The extent of this influence depends upon the will of a distinct government. To any extent, however inconsiderable, it is a burden on the operations of the government. It may be carried to an extent which shall arrest them entirely."

*Bank of Commerce* v. *New York City*, 2 Black., 620, was a case where the city of New York imposed a tax on the property of the Bank of Commerce, which consisted in part of United States bonds. It was held by the Supreme Court of the United States that stock of the United States is not subject to State taxation, and that a State tax for that purpose is unconstitutional, whether it imposes the tax on United States stock *eo nomine*, or includes it in the aggregate of the tax-payer's property, to be valued like the rest at its worth. *Osborne* v. *The United States*, 9 Wheat., 732; *Bank Tax Case*, 2 Wallace, 200.

These decisions are binding upon the State Courts in respect to the questions therein raised and determined. The Supreme Court of the United States is the supreme judicial tribunal of the Union, the final arbiter of all cases in law

and equity arising under the constitution and laws of the United States.

There are two modes of treating its adjudications; the one is the constitutional mode of obedience with peace; the other is the nullification mode with secession and war. There is *now* no room to doubt which is the better policy.

The question presented to us is whether the case at bar comes within the principles of the adjudged cases we have cited. The Act of Congress entitled "An Act to provide a national currency secured by a pledge of United States stocks, and to provide for the circulation and redemption thereof," approved Feb. 25, 1863, under which the First National Bank of Bangor was organized, (§ 5,) authorizes the formation of associations for carrying on the business of banking, with power (§ 11,) to obtain and issue circulating notes, discount bills, notes, &c., receive deposits, buy and sell gold and silver bullion, foreign coin and bills of exchange, and, in general, to perform all the offices of banks of discount and deposit. These bills are made "receivable (§ 20,) at par, in all parts of the United States, in payment of taxes, excises, public lands, and all other dues to the United States, except for duties on imports; and also for all salaries and other debts and demands owing by the United States to individuals, corporations and associations within the United States, except interest on the public debt, and in the redemption of the national currency."

The powers and privileges thus conferred upon these associations are calculated to become the source of great pecuniary profit to the members. By that Act, United States bonds, when thus invested, assume a new character, entitling the holders to receive, not only the specified interest, but also the profits arising from this new use of them. It is optional with the bondholders whether they will avail themselves of this new use. If they choose to do so, their investment becomes subject to the incidents which legally attach to the transaction, and to the vicissitudes attendant thereon. The national government gives them no guaranty,

either express or by implication, that this use of its bonds, shall be exempt from taxation, or prove a profitable investment. If, for any cause, they become dissatisfied with the enterprise, they can discharge the liabilities of the corporation, redeem its bills, and reclaim their bonds of the government; they voluntarily formed, and they may voluntarily dissolve their association.

Under the constitution, the several States are component parts of our political system. The maintenance of the State governments in all their vigor and integrity is indispensable to the healthy action of the national government. The former no less than the latter require great pecuniary means to enable them to perform their constitutional functions. By an Act of Congress, imposing an onerous tax upon State banks, the banking business of the country is indirectly conferred upon the national banks. The States have no equivalent for the loss of the large revenue derived from a tax on the State banks, unless they have authority to tax the shares held in the banks which Congress has authorized to be established in their place.

The national government owns no part of the capital stock of the national banks; nor has it any pecuniary interest in their operations. It indeed holds their stock, in the capacity of trustee, for the security of the bill holders, and may employ them as depositaries of the public funds; but it has no share in the profit or loss of their business. Nor are these associations necessary to enable the national government to carry on its fiscal operations. The powers granted to Congress "to coin money and regulate the value thereof," and to issue United States notes, are ample for all such purposes. Indeed, all the national banks in the country might be closed up, in the mode provided by law, without detriment to the national credit or finances, whatever might be the effect upon the stockholders, or the general business of the country. National banks are private associations, authorized by Congress for the joint purposes

of convenience and profit to the holders of United States bonds, and of furnishing the' public with a convenient and uniform circulating medium.  They were intended to be to the nation what a well regulated system of State banks was to the States respectively.

In legal contemplation, the property in the capital stock of a national bank is in the corporation, *eo nomine*, which has the same right to control it, within the powers conferred by its charter, that a private individual has to deal with his own property.  While such is the power of the corporation over the corporate property, as a whole, the shareholders have each a separate and distinct interest therein.  This interest consists in the right to participate in the profits, according to the number of shares they may own respectively, and to a distributive share of the residue of the corporate · property after the payment of its debts.  A burden, therefore, imposed upon the corporation, or its property, *eo nomine*, affects the operations of the corporation, while a burden upon the shares affects the shareholders.  The right to do the latter does not necessarily imply a right to do the former.

From this process of reasoning, it results, that a State tax on the shares owned in national banks is not, like the tax in the cases cited, a tax on the corporation, or the bonds composing its capital stock, or the property of the corporation, or the operations of the national government, but a tax on the new use to which the shareholders have put their bonds.  So far from being in conflict with the right and duty of the national government to maintain the faith and credit of the United States inviolate, such a tax is in strict harmony therewith, and rests upon the solid foundation of both reason and authority.  *Van Allen* v. *Nolan*, 3 Wallace, 573; *Duer* v. *Com. of Taxes*, 4 Wallace.

These decisions were made in cases arising under the Act of Congress of June 3, 1864, which contains certain provisions in regard to State taxation.  The Act of Congress of Feb. 25, 1863, under which the case at bar comes before us, contains no such provisions, and the question is whether

the shares in national banks, established under this Act, are taxable by State authority.

This involves an inquiry into the respective powers of the States and the United States, over the subjects of taxation. Previous to the adoption of the national constitution, the several States, though united under the Articles of Confederation for certain purposes, were in most respects sovereign and independent States. Among the powers possessed by them respectively, was the sovereign power of taxation, the nature and extent of which are thus stated by Chief Justice MARSHALL, in *Providence Bank* v. *Billings,* 4 Pet., 563.

" The power of legislation, and consequently of taxation, operates on all the persons and property belonging to the body politic. This is an original principle which has its foundation in society itself. It is granted by all for the benefit of all. It resides in government as a part of itself, and need not be reserved where property of any description, or the right to use it in any manner, is granted to individuals or corporate bodies. However absolute the right of any individual may be, it is still in the nature of that right, that it must bear a portion of the public burdens, and that portion must be determined by the Legislature."

Upon the subject of the respective powers of the several States, and of the United States, in respect to taxation, the same eminent jurist, in *McCulloch* v. *Maryland,* remarks as follows :— " The power of taxation is one of vital importance ; that it is retained by the States ; that it is not abridged by the grant of a similar power to the government of the Union ; that it is to be concurrently exercised by the two governments, are truths which have never been denied. But, such is the paramount character of the constitution, that its capacity to withdraw any subject from the action of even this power is admitted."

As the powers of the States were known, and recognized, it became unnecessary to enumerate and define these in the constitution ; being derived from the people of the respec-

tive States, and not from the American people collectively, they remained the same after the adoption of the constitution as before, except so far as they are limited or prohibited by that instrument. Even a specific grant of power to the national government is not inconsistent with the exercise of the same power by the States, when it is not exercised by the supreme government. In *Sturgess* v. *Crowningshield*, 4 Wheat., 196, the Supreme Court of the United States held that, notwithstanding the grant of power to Congress to establish a uniform system of bankruptcy, a State has authority to pass a bankrupt law, provided there is no Act of Congress in force upon the subject. In that case, the Court say, — "The power granted to Congress may be exercised or declined, as the wisdom of that body shall decide. If, in the opinion of Congress, uniform laws concerning bankruptcies ought not to be established, it does not follow that partial laws may not exist, or that State legislation on that subject must cease. It is not the mere existence of the power but its exercise which is incompatible with the exercise of the said power by the States. It is not the right to establish these uniform laws, but their actual establishment which is inconsistent with the partial acts of the States." The same doctrine has been held in respect to other powers granted to Congress where Congress has not seen fit to call them into exercise. *Wilson* v. *Blackbird Creek*, 2 Pet., 245 ; *Cady* v. *Port Wardens of Philadelphia*, 12 How., 299.

In these cases, no enabling Act of Congress is necessary to authorize the States to exercise the powers specifically granted to Congress, when Congress does not avail itself of its paramount authority to exercise such powers. Upon what principle then, does an enabling Act of Congress become necessary to authorize the States to tax the shares in moneyed corporations, created under the implied powers of Congress? The power of the States in respect to taxation are quite as important as their power to pass bankrupt laws. The former power, no less than the latter, is derived, not

from Congress, but from the original right of the States themselves over the subject. Indeed, Congress cannot confer the power of taxation upon the States; nor is it competent for the States to receive such grant of power. If the States possess this power at all, it is in virtue of their inherent authority as States of the United States.

This doctrine is expressly recognized in *Van Allen* v. *Nolan*. In that case the Court say, — "The power of taxation, under the constitution, as a general rule, and as has been repeatedly recognized, in adjudged cases in this Court, is a concurrent power. The qualifications of the rule are the exclusion of the States from the taxation of the means and instruments employed in the exercise of the functions of the Federal government. * * * As it respects a subject matter over which Congress and the States may exercise a concurrent power, but from the exercise of which Congress, by reason of its paramount authority, may exclude the States, there is no doubt Congress may withhold the exercise of that authority and leave the States free to act."

In that case, the Court held that a State tax on the shares of national banks is not a tax on the bonds of the government which constitute their capital stock, or upon "the means and instrumentalities employed by the national government," and that "it involves no question as to the pledged faith of the government." This result is in harmony with the language of Chief Justice MARSHALL, qualifying the decision in *McCulloch* v. *Maryland.* "This opinion," he remarks, "does not deprive the States of any resources which they originally possessed. It does not extend to the tax paid by the real property of the bank in common with other real property within the State, nor to a tax imposed on the interest which a citizen of Maryland may hold in this institution in common with other property of the same description throughout the State."

Moreover, it is to be observed, that a State tax for State purposes is not inconsistent with a national tax assessed upon the same subject for national purposes, because the

exercise of such power by a State is not the exercise of a power granted to Congress; Congress is not empowered to levy taxes for the purposes which are in the exclusive province of the States. In general, therefore, when each government exercises the power of taxation over the same subject matter for their respective purposes, neither is exercising the power of the other, but both are harmoniously acting within their respective spheres *Gibbons* v. *Ogden*, 9 Wheat., 200.

The conclusion deducible, both from principle and the authorities, would seem to be, — (1,) that, in general, the power of taxation is a concurrent power, to be exercised by the States or the national government, or by both, in respect to the same subject matter; — (2,) that the States have no power to tax the means and instruments employed by the national government in the discharge of its constitutional functions; — (3,) though the States and Congress may exercise a concurrent power of taxation over a subject matter, yet it may bear such a relation to the national government that Congress, by reason of its paramount authority, may exclude the States from the exercise of their concurrent right; and — (4,) that when, in the latter case, Congress does not exercise its right of exclusive taxation the States are left free to exercise their concurrent powers. The shares in national banks are of this last description. From the relation which these associations sustain to the national currency, and the fact of their creation by Congress, the latter might undoubtedly regulate or prohibit State taxation of their shares; but, in the absence of any such qualification, or prohibition, the States are remitted to the exercise of their power of taxation.

But it is unnecessary for us to place the decision of this case upon this ground. The Act of Congress of Feb. 25, 1863, is made subject to future amendment; and the Act of June 3, 1864, is a substantial re-enactment of that Act, with certain amendments, including that concerning State taxation. Section 41, providing that "nothing in this Act

shall be construed to prevent" State taxation, under the prescribed limitations, is an authoritative interpretation by Congress of the intent and meaning of the Act of 1863, upon this subject; and this rule of taxation is applicable to banking associations, established under either Act of Congress.

It is not improbable that the silence of the Act of 1863, in respect to local taxation, produced the impression in the public mind that the shares in national banks are not thus taxable, and that Congress improved this early opportunity to remove all doubt upon the subject.

While such are the relative powers of both governments in respect to taxation, the power of the national government is sovereign, and extends to every species of property and every citizen within its jurisdiction. It is a necessary incident of the right of property, immanent in the property itself, and creating an inchoate mortgage upon it, that it is liable to bear a share of the public burdens. The right of the citizen to the protection of the government depends, in a great degree, upon the obligation to furnish the government with the means of protection. Indeed, the reciprocal duties of allegiance and protection cannot be performed without the sovereign right of taxation. Congress may forbear to exercise this power, in certain cases, but the power is unquestionable. A public exigency might arise, when, to exempt a particular species of property from taxation, would be to deny to the government the power of self-preservation; such exigency might become even more urgent than that which shielded the same property from taxation. *Magna Charta* of 1789 allows no titles of nobility, creates no monopoly of rights of property, and surrenders no power of taxation over the means of self-preservation.

The tax of which the plaintiff complains was assessed in the usual mode; and it is not pretended that it is unequal, or differs from that imposed by the State upon the shares of State banks, or other similar property, or that it is, in any respect, incompatible with the rule prescribed by Con-

gress. Our conclusion, therefore is, that the shares owned by the plaintiff are legally taxable by the State.

Before, however, municipal officers can rightfully assess a tax upon the shares of national banks, they must be authorized so to do by some law of the State. They are the creatures of State law, and derive their powers, in this respect, solely from State enactments.

Though the shares in national banks are not specifically mentioned in our tax Act, we think they are included in § 5, c. 6, of R. S., "which authorizes the taxation of all shares in moneyed corporations." Sections 79 to 82, of c. 47, R. S., prohibiting the establishment of banking companies in this State without authority of the Legislature, were not intended to apply to banking corporations created by authority of Congress, since such corporations may be legally established in the State without the consent of the Legislature.

According to the agreement of the parties the
*Nonsuit must be confirmed.*

CUTTING and BARROWS, JJ., concurred.

KENT and TAPLEY, JJ., concurred in the result.

APPLETON, C. J. — I do not concur. The State had a right to tax the stockholders in national banks, without the authority of Congress, or it had not.

If the State had that right, — then, having that right, Congress had no power to interfere in the mode, manner or place of its exercise. The stock of national banks would be like the stock of other corporations, over which the United States have no control. It is not contended that Congress can interfere as to the taxation of the stock of State banks. Consequently, if the doctrine of the opinion is correct, the legislation of Congress upon the subject would be unconstitutional.

But Congress have given liberty to tax the stock of national banks, and directed when, where and how it should be taxed. Act of Congress, June 3, 1864. The Supreme

Court of the United States have decided that the different Acts of Congress on this subject are constitutional, and that the *only* right to tax this stock is derived from the Acts and that it must be exercised in accordance with their provisions. *Van Allen* v. *Assessors*, 3 Wallace, 573; *People* v. *Commissioners*, 4 Wallace, 244. It follows therefore, conclusively, that, without such legislation, the taxation was illegal, and the plaintiff is entitled to recover.

WALTON and DANFORTH, JJ., concurred.